**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

HOSEA PROJECT MOVERS, LLC, et al.,        Lead Case No. 1:15-cv-799

        Plaintiffs,        Barrett, J.
        Bowman, M.J.

    v.

WATERFRONT ASSOCIATES, INC.,  et al.,

        Defendants.


**MEMORANDUM OPINION AND ORDER**

This consolidated case involves multiple disputes but the same core event: the August 5, 2014 sinking of the Waterfront Barge (hereinafter "Barge"). A primary dispute concerns the insurance coverage for that event. Currently pending is a motion to compel filed by the insured, Waterfront Associates ("Waterfront"), against its insurer, United States Fire Insurance Company ("U.S. Fire"). For the reasons that follow, Waterfront's motion will be DENIED.

**I.    Background**

More than three years prior to its sinking, the sunken Barge operated as a floating restaurant. However, on March 11, 2011, the Barge broke away from its moorings in Covington, Kentucky, and the restaurant closed, never to reopen. Six months later in September 2011, Waterfront sought and obtained insurance on the Barge from U.S. Fire. The insurance policy ("Policy") was renewed in 2013, with an

effective date through October 1, 2014. (Case No. 1:15-cv-46, Doc. 1 at ¶12; Doc. 9 at ¶12).

On or about February 6, 2014, ice caused the Barge to again break away from its moorings. After that, Waterfront hired C&B Marine, LLC ("C&B") to move the Barge from Covington, Kentucky to Hebron, Kentucky to C&B's facility. (*Id.*, Doc. 35 at ¶10-12). Waterfront made a claim against U.S. Fire for damages that arose from the February incident. Douglas Ottey was the claims handler assigned to this first claim; Ottey also managed Waterfront's claim six months later for the sinking of the Barge.

U.S. Fire retained a marine surveyor, Bruce Bacon, to investigate the February claim. On June 13, 2014, U.S. Fire advised Waterfront that the Policy did not cover the portion of its claim that sought recovery for damage to the Barge's access ramps. Waterfront disputed U.S. Fire's position. On June 19, 2014, U.S. Fire retained outside counsel from New York, James Forde, to offer legal advice in connection with the February 2014 claim. U.S. Fire issued a formal declination of coverage for the "access ramps" portion of Waterfront's February claim on July 23, 2014.

Waterfront alleges in its third-party complaint that on June 26, 2014, while still under the care, custody and control of C&B, the Barge was struck by another barge, identified as Barge AEP 2015 ("Allision"). (*Id.*, Doc. 1 at ¶27; Doc. 9 at ¶17; Doc. 35 at ¶17). Waterfront asserts that Ottey was notified of the June 2014 incident, but U.S. Fire, pointing to Ottey's deposition testimony and other documentary evidence, denies receiving notice of the June collision until August, after the Barge sank. (See Doc. 59 at 35-37).

On August 6, 2014, Waterfront reported the previous day's discovery that the Barge had sunk at its mooring, under what U.S. Fire asserts were normal conditions. An August 6 email from Waterfront's insurance agent reporting the loss to U.S. Fire states in part:

> [O]n 6/26/14 the [Barge] was hit by a crane barge being operated by McGinnis Towing. Supposedly they had the restaurant/barge inspected and repairs made to the damage that they caused. On 8/4/14, C&B Marina who insured is paying to moor/care for the restaurant/barge, moved it from original mooring location to new location mooring. It was discovered "sinking" morning of 8/5/04.
>
> Agent believes either McGinnis Towing or C&B Marine are either partially [or] fully responsible for the loss.

(Case No. 1:15-cv-799, Doc. 61-1 at 2).

Almost immediately, U.S. Fire raised questions about the cause of the sinking. U.S. Fire expressed concerns about Waterfront's alleged failure to notify U.S. Fire of the earlier June collision, whether Waterfront had maintained the Barge in a seaworthy condition, and/or planned to reopen the vessel as a restaurant. Claims handler Ottey testified that the report of the sinking raised "deep concerns" relating to the Barge's condition, the prior unreported collision, and the sinking in calm conditions, which Ottey believed presumptively to be the result of an unseaworthy condition. (Doc. 59, Ottey Dep. at 106:23-107:3, 110:23-111:16). Several emails referenced a contemporaneous news story that apparently added to the insurer's concerns. An email from Ottey, dated August 6, reads in relevant part:

> We have appointed a surveyor to look into the reasons why the barge sank….The insured [Waterfront] never informed us of that [June 26] second incident, because it is alleged that he was pursuing a claim against the vessel that caused the collision. We are unsure of the

3

> seaworthiness of the vessel after the collision, but our surveyor from the 2/14 incident, reported that the vessel may have sank because the water pump may have been turned off. Our surveyor from the first [February 2014] incident also confirmed the rumor that the insured intended to scrap the vessel.

(Doc. 61-2 at 1). The record reflects that two marine surveyors were engaged by U.S. Fire to investigate: Bruce Bacon, who had previously been engaged for the February claim, and a second surveyor identified as Armand Cuevas.

On August 15, 2014, U.S. Fire expanded Attorney Forde's retention from the February incident to include legal advice with respect to the August sinking.[1] Forde has filed an affidavit attesting that he was not asked to, and did not investigate, the facts and circumstances of the sinking. (Doc. 62-1).

After the Barge sank, U.S. Fire advanced $500,000.00 of the policy proceeds to C&B Marine, LLC ("C&B"), to remove and dispose of the sunken vessel. However, U.S. Fire advanced that payment under a formal reservation of rights as to coverage issues. (Doc. 61-5). The August 20, 2014 reservation of rights letter referred to the allegedly undisclosed June 26, 2014 collision, as well as the fact that the policy does not cover loss "from want of due diligence." (*Id.* at 2).

Also on August 20, 2014, Waterfront's insurance agent sent an email alerting the wholesale insurance broker who placed Waterfront's policy with U.S. Fire that Waterfront "is talking about filing a bad faith claim in regards to the 2/6/14 loss *and the current [August 5] loss.*" (Doc. 62-5 at 3, emphasis added). The broker transmitted the same email to U.S. Fire two days later, on August 22. Waterfront's insurance agent

---

[1]At some point that is neither clear from the current record nor relevant to the pending motion, U.S. Fire ceased employing Forde.

testified that by August 20, Waterfront's attorneys were involved with its claim. (Doc. 50, Berger Dep., 96:4-97:24).

As stated, U.S. Fire hired marine surveyors Cuevas and Bacon to inspect the Barge as part of its investigation of the August claim. On August 27, 2014, U.S. Fire had, through Attorney Forde, additionally engaged a naval architect, William Leschaeve. At 4:41 pm that day, Claims Handler Ottey forwarded the CV of Leschaeve to Cuevas and Bacon, indicating that U.S. Fire's head of claims "would like you [to] consider retaining [Leschaeve]." (Doc. 61-6 at 2). However, Leschaeve's CV had been sent to Attorney Forde earlier on the same day, and both Ottey and Forde unequivocally testified and/or averred that it was Forde and not Cuevas who ultimately retained Leschaeve. Forde's affidavit further attests that Leschaeve reported directly to him, and not to Ottey or any other U.S. Fire claim investigator, and that Cuevas and Bacon likewise did not report to either Attorney Forde or Consultant Leschaeve. (Doc. 62-1, at ¶¶ 12-17).

During the investigation, and while accompanied by both Laschaeve and by Waterfront's corporate maintenance manager, Danny Thomas, Cuevas and Bacon inspected and removed a coupon (steel section) from the hull of the vessel. The section removed was part of U.S. Fire's investigation into a section of the hull that had been previously repaired. On September 10, 2014, an email from Forde to Leschaeve directs Laschaeve to "make sure you and [Cuevas] maintain a chain of custody for any hull material cropped out and have the divers if possible take pictures as they are cropping…. We want to avoid spoliation issues as we progress." (Doc. 61-9 at 40).

Despite the removal and examination of the coupon section of the hull, Waterfront's corporate manager testified that, to his knowledge, the divers did not find a cause for the sinking. (Doc. 48, Thomas Dep., at 109:8-18).

Subsequently on September 17, Cuevas communicated to U.S. Fire Claims Handler Ottey that C&B Marine <u>may</u> be responsible for the sinking, and U.S. Fire wrote to Waterfront demanding that it put C&B on notice that it may be potentially responsible for the loss. (Docs. 61-10, 61-11). The communications did not ascribe a definite cause for the sinking, and Ottey and others testified that no definite cause was ever determined.

On November 10, 2014, U.S. Fire notified Waterfront of its "Named Peril" defense, stating that it "is the burden of the Assured to show what named peril triggered coverage….and that such loss or damage was not as a result of want of due diligence by the Assured." (Doc. 61-14). In November and December 2014, Claims Handler Ottey exchanged emails with Waterfront that referred to the ongoing investigation and Ottey's need to review a report by U.S. Fire's "forensic engineer." The meaning of the reference to a "forensic engineer" is unclear. Ottey testified that U.S. Fire did not determine the cause of the sinking, and that Leschaeve's advice was not considered or used in reaching the decision to deny coverage. (Doc. 59, Ottey Dep., 104:20-22 and 149:6-11; *see also id.* at 151-152).

On December 10, 2014, Laschaeve issued a draft report that was addressed solely to Forde, but that was shared with U.S. Fire as an attachment to an email between Forde and the head of claims of U.S. Fire.

On January 21, 2015, U.S. Fire simultaneously issued its formal denial of Waterfront's claim and filed suit against Waterfront, seeking a judgment to declare its insurance policy to be void *ab initio*, or in the alternative, to declare that there is no coverage and ordering Waterfront to repay U.S. Fire $500,000.00 plus interest, costs, and attorney's fees. U.S. Fire maintains that the policy is void in part because Waterfront failed to disclose or misrepresented "the full condition" of the vessel - namely, that "it was in a state of advanced deterioration and wastage and was not in a serviceable or …seaworthy condition." (*See* Case No. 1:15-cv-46, U.S. Fire Complaint at ¶¶16-17). U.S. Fire further alleges that Waterfront misrepresented its intentions to reopen the Barge as an operating restaurant. (*Id.* at ¶¶`19-20).

Waterfront filed a Counterclaim against U.S. Fire for breach of its contract of insurance. Waterfront alleges bad faith, and seeks a judgment "of Waterfront's actual losses and attorney's fees and expenses and punitive damages in the amount of $3,400,000." (Waterfront's Counterclaim at 14).

Waterfront also filed a third party complaint against C&B, alleging that C&B's actions caused the Barge to sink.[2] U.S. Fire followed suit with a cross-claim against C&B, contingent upon U.S. Fire being subrogated to Waterfront for the claimed loss of the Barge. If C&B is responsible for the sinking, U.S. Fire seeks to hold C&B liable for the $500,000 in insurance proceeds that U.S. Fire previously advanced to pay for the disposal of the sunken Barge.

---

[2]Waterfront alleges both that the Barge was struck in June 2014 while under C&B's care, custody, and control, and that C&B was negligent when it repositioned the Barge the day before the Barge sank.

On September 6, 2017, U.S. Fire filed a motion seeking summary judgment, in which it argues that:

> i) the policy issued to Waterfront was voidable *ab initio* due to Waterfront's misrepresentation and/or non-disclosure of material information; and/or, ii) in the alternative, that Waterfront cannot carry its burden to prove the loss of the Barge was caused by an insured Peril; and/or iii) that Waterfront breached the policy provisions against change in ownership, management or transfer/assigning or pledging the Barge…voiding coverage and releasing U.S. Fire from any obligation to indemnify Waterfront…; and iv) that Waterfront is obligated to reimburse U.S., Fire the $500,000 advanced to pay C&B Marine, LLC; and v) grant such other and further relief the Court deems appropriate.

(Doc. 52 at 1-2).

On September 19, 2017, the undersigned conducted a telephonic hearing to discuss a discovery dispute that arose in connection with U.S. Fire's motion for summary judgment. Based upon the informal telephonic arguments of the parties, the undersigned determined that written briefs were appropriate. In accordance with the expedited briefing schedule set by the Court, Waterfront filed its motion to compel additional discovery on September 27, 2017. U.S. Fire filed its response in opposition on October 4, 2017, and Waterfront filed a reply on October 9, 2017.

## II.    Waterfront's Motion to Compel Discovery

Waterfront's motion is based upon its position that U.S. Fire is refusing to disclose relevant facts concerning the cause of the sinking and U.S. Fire's investigation, based upon overbroad assertions of the attorney-client and work product privileges that encompass the work of Consultant Leschaeve and coverage counsel Attorney Forde. Waterfront contends that the information is particularly relevant to U.S. Fire's "Insured

Peril" defense to payment of the policy, which places the obligation on the insured to identify that the loss was a covered event under the Policy.

Waterfront complains that after identifying its claims file as responsive, U.S. Fire "refused to produce discoverable information related to the cause of the sinking." (Doc. 61 at 5, citing Doc. 61-18). For its part, U.S. Fire maintains that its surveyors, Cuevas and Bacon, never determined the cause for the sinking. Suggesting that even if Bacon and Cueves did not find a cause, consultant Leschaeve may have factual information relating to the cause, Waterfront identifies the following three items as the focus of its motion:

1.  Redacted email correspondence dated September 5, 8, and 9, 2014, between Attorney Forde, and Consultant Leschaeve (Doc. 61-9);

2. Answers to questions posed to U.S. Fire's Claims Handler, Douglas Ottey (Doc. 61-20) concerning whether he ever received Leschaeve's report (in September 2014 or otherwise), whether it was ever part of the claims file, who directed Leschaeve to issue his report to Forde, and whether Leschaeve revised his report; and

3. An *in camera* review of all other emails identified by U.S. Fire as "attorney advice" to determine whether Forde "was acting simply as a claims handler" and/or whether the emails otherwise relate to Waterfront's bad faith claims against its insurer.

(Doc. 61 at 6-7).

Waterfront argues that U.S. Fire "never disclosed any of the facts it discovered related to the sinking of the Waterfront Barge or the opinions issued by anyone who examined the barge." (Doc. 61 at 4). However, Waterfront's assertion ignores that U.S. Fire has disclosed the unredacted files of Cuevas and Bacon; all communications with Cuevas and Bacon (including the reports from the divers retained by those two marine surveyors), and its claims files from both the February and August 2014 claims. The parties' real dispute, then, is disclosures that U.S. Fire withheld concerning Attorney Forde and Consultant Leschaeve.

U.S. Fire maintains that Forde was hired as counsel to offer legal advice regarding coverage issues, that Forde anticipated litigation, and that any and all information relating to Leschaeve is protected by the attorney-client and work product privileges, as well as by Rule 26(b)(4)(B), because Leschaeve was specifically retained as a "litigation consultant."

## A. Federal Law and the Scope of the Asserted Privileges

The insurance policy that underlies the dispute between U.S. Fire and Waterfront is a marine insurance policy, and the parties agree that this case falls within this Court's original Admiralty jurisdiction, pursuant to 28 U.S.C. § 1333. *See generally Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 313-14 (1955). Therefore, to the extent that state and federal law may disagree, any questions concerning privilege are to be determined by federal common law. *Reed v. Baxter*, 134 F.3d 351 (6th Cir. 1998) (citing Fed. R. Evid. 501). Even when pendent state claims are involved, case authority suggests that federal common law would be controlling to the extent that federal and

state law privilege law diverge. *See Hancock v. Dobson*, 958 F.2d 1367, 1373 (6th Cir. 1992); *see also Freed v. Grand Court Lifestyles, Inc.*, 100 F. Supp.2d 610, 612 (S.D. Ohio 1998); *Hartford Fire Ins. Co. v. Garvey*, 109 F.R.D. 323, 327 (N.D. Ca. 1985) (federal common law applied to determine privilege issues presented under admiralty law). Moreover, federal law, not state law, governs the work product doctrine even in diversity cases. *See In re Prof'ls Direct Ins. Co.*, 578 F.3d 432, 438 (6th Cir. 2009).

In support of its motion to compel, Waterfront relies most heavily upon cases under Ohio law that support a broad "exception" to the attorney-client privilege doctrine, and arguably to work product, when an insured asserts a first party claim of bad faith. As the undersigned has previously recognized, Ohio law appears to be somewhat distinctive in this respect. *See generally RLI Ins. Co v. Fifth Third Bankcorp*, 2016 WL 8201161 at **3-4 (S.D. Ohio July 27, 2016) (discussing Ohio Supreme Court's holding in *Boone v. Vanliner Ins. Co.*, 744 N.E.2d 154 (Ohio 2001) and its progeny concerning attorney-client privilege). In part because of difficult issues involving the scope of privilege, it is not uncommon for courts to bifurcate a bad faith claim from the underlying breach of contract claim against an insurer. *Id.* Waterfront has not cited any cases under federal common law that align with Ohio's somewhat expansive view on the exception to traditional privileges when a bad faith claim is made against the issuer of a marine insurance policy.[3]

---

[3]U.S. Fire challenges the application of Ohio law to discern attorney-client privilege even if this were not an admiralty case, pointing out that Forde was a New York attorney communicating with his New York based insurance client. Having determined that federal common law controls, the undersigned finds no need to wade into choice of state law issues.

Despite Waterfront's failure to cite to more persuasive case law, the undersigned recognizes that U.S. Fire, as the party asserting a privilege, has the burden to prove the applicability of any claimed privilege. Moreover, federal law does not differ from state law in holding that privileges are to be construed narrowly. *See In re Grand Jury Investigation No. 83-2-35*, 723 F.2d 447, 450-451 (6th Cir. 1983).

The attorney-client privilege generally protects confidential communications between a lawyer and a client, but can also apply to agents of a lawyer who are employed in order to provide legal advice. "The privilege applies to factual investigations conducted by counsel at a corporate client's request (to provide legal advice to that client), and also to agents of an attorney who are assisting in rendering legal advice to the client." *In re Behr Dayton Thermal Products, LLC*, 298 F.R.D. 369, 373 (S.D. Ohio 2013). Specifically, this Court has held that the following criteria must be satisfied to be protected under the attorney-client privilege:

> (1) Where legal advice of any kind is sought (2) from a professional legal advisor in his [or her] capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself [or herself] or by the legal advisor, (8) unless the protection is waived.

*Id.* (quoting *Reed v. Baxter*, 134 F.3d 351, 355-56 (6th Cir. 1998)). U.S. Fire maintains that it hired Forde to obtain legal advice over coverage issues, and that Laschaeve was hired by Forde, such that Laschaeve's communications with Forde, including his draft report, are protected by attorney-client privilege. Forde's affidavit supports that position. (Doc. 62-1).

12

In addition, U.S. Fire argues that Laschaeve's communications are protected by the work product privilege under Rule 26(b)(3), which protects any document or tangible thing that has been "prepared in anticipation of litigation… by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)."  Last but not least, U.S. Fire contends that Laschaeve's investigation and opinions are protected from disclosure under Rule 26(b)(4)(D), which separately defines a privilege for litigation consultants.  As U.S. Fire points out, other courts have recognized Rule 26(b)(4)(D)'s applicability to marine surveyors and investigators.  *See e.g., B.M.I. Interior Yacht Refinishing, Inc. v. M/Y CLAIRE*, 2015 WL 4316929 (S.D. Fla., July 15, 2015) (finding rule applicable to marine surveyor's report).

### B.  The Purpose For Which Leschaeve Was Hired

Waterfront disputes the contention that Leschaeve was hired by Forde to assist him in providing legal advice, and asserts that Leschaeve was instead hired by U.S. Fire as part of its factual investigation of the underlying claim.  Waterfront repeatedly lumps Leschaeve in with Cuevas and Bacon as if U.S. Fire and/or Ottey retained all three solely to investigate the claim.  Waterfront maintains that the "Bacon-Cuevas-Leschaeve investigation is not protected" by either attorney-client or work product privileges.  (Doc. 64 at 2).

Based on the totality of exhibits submitted by both parties, however, the undersigned concludes that there were two separate investigations.  The claims investigation was conducted by Cuevas and Bacon for U.S. Fire and its claims handler, Ottey.  At the same time, the record supports U.S. Fire's position that Leschaeve was

independently engaged by Attorney Forde in a separate but near-contemporaneous investigation undertaken by outside coverage counsel.

Forde was already engaged by U.S. Fire as counsel on the dispute over the February claim, which had been formally denied on July 23, less than two weeks prior to the date the Barge sank. By August 15, U.S. Fire had expanded its retention of Forde to provide legal advice about the August claim. On August 20, 2017, U.S. Fire issued its first formal reservation of rights letter.

Waterfront alleges, citing Ottey's deposition testimony, that the decision to have Forde retain Leschaeve "was a tactical afterthought to prevent…discoverability" of any report that would be generated by Leschaeve. (Doc. 64 at 2, citing Doc. 64-22). Although Ottey's limited testimony can be interpreted as suggesting that U.S. Fire was intentional about separating Forde's retention of Leschaeve as a consultant from the underlying claims investigation,[4] in part to avoid any future discovery of any report he might produce, it followed through on that intention from the outset of its retention of Leschaeve on August 27. The only suggestion that U.S. Fire ever *considered* hiring Leschaeve for purposes of its underlying claims investigation <u>prior to his retention</u>, rather than as an independent consultant to Attorney Forde is the fleeting (and disregarded) suggestion in an email from Ottey to Cuevas and Bacon that they retain Leschaeve.[5] Forde's affidavit and Ottey's testimony both confirm that Forde hired Leschaeve.

---

[4]Ottey was repeatedly directed not to answer questions on grounds of privilege.
[5]Some evidence suggests that Leschaeve's name was first identified by U.S. Fire's head of claims to Attorney Forde, but the fact that U.S. Fire may have identified Laschaeve as a potential expert to its counsel is not probative evidence on whether U.S. Fire itself hired Laschaeve to conduct an investigation

Waterfront cries foul, arguing that U.S. Fire "deceived Waterfront as to its intentions" because U.S. Fire gave the appearance of assisting Waterfront by hiring Cuevas and Bacon to investigate the cause of the sinking.  However, both Waterfront and U.S. Fire appeared extremely wary of each other's positions from the outset of the claims investigation.  Waterfront argues that "[i[t was not until November 10 when Ottey raised the named perils defense that there was any indication that Waterfront and [U.S. Fire] were adverse to each other." (Doc. 61 at 10).  But ample evidence suggests that by the time the reservation of rights letter was issued on August 20, a week prior to the retention of Leschaeve by Forde, the parties were aware of the likelihood that they would be adverse.  By August 20, 2014, when U.S. Fire issued its first reservation of rights letter,  Waterfront's own attorneys also were involved.  In addition to the threat of bad faith litigation by Waterfront that was conveyed to U.S. Fire on August 22, correspondence from Forde discussing the potential retention of Leschaeve refers to his regular hourly rates, and adds "*trial is 340 per hour*." (Doc. 61-6 at 1, emphasis added).

Citing *Indianapolis Airport Authority v. Travelers Property Cas. Co. of America*, 2014 WL 7360049 (S.D. Ind., Dec. 23, 2014), Waterfront argues that a reservation of rights letter alone is not sufficient to place the insured and insurer adverse to each other. *See id.* at *4* (holding that determining whether primary purpose of document is in anticipation of litigation or for ordinary claims evaluation must be determined on case-by-case basis, but noting "presumption" that documents created prior to claim denial are not work product).  However, unlike the facts of that case, in this case a very short period of time elapsed between the hiring of outside counsel (the same counsel who

of the claim.

was already engaged in ongoing legal advice regarding the partial denial of a different claim), the reservation of rights letter, and the final formal denial and initiation of suit just five months later. Even Waterfront concedes that it was aware by November 10, when notified of the insured peril defense, that its interests were adverse to those of its insurer.

Based upon Forde's affidavit and the course of conduct between the parties within days of the sinking of the Barge, the undersigned concludes that concern over possible litigation prompted U.S. Fire to engage Forde to provide it with additional legal advice concerning coverage issues. In addition to the reference by Waterfront's agent on August 20 to its consideration of a bad faith claim, Ottey for U.S. Fire immediately raised questions about the June 26 (allegedly unreported) collision. Surveyor Cuevas suggested in a September 17, 2014 email that "C&B may be held responsible" but also wondered if notice was "premature" since no conclusion as to the cause had been reached." (Doc. 61-10).

Another indication of the parties' increasingly adverse positions appears in correspondence dated September 23-24, 2014, when Waterfront's insurance agent abruptly informed Ottey that "Mr[.] Ruby's lawyer…does not want your lawyer [Forde] or yourself to be included in tomorrow's meeting." Ottey expresses dismay at Waterfront's position, but informs Waterfront that "the surveyors [Cuevas and Bacon] cannot meet the insured until they have completed their report on cause." (Doc. 64-1).

Based on the fact that Laschaeve accompanied the two surveyors during their inspection of the Barge, Waterfront repeatedly asserts that the two surveyors hired

Laschaeve.[6]  However, the fact that Laschaeve conducted his investigation at the same time does not mean that it was the same investigation.   In fact, an email dated September 3, 2014 from Ottey to his surveyors, Cuevas and Bacon, asks whether Laschaeve will "be on site" at the time that the surveyors had scheduled a dive, "or has he already conducted <u>his</u> investigation?"  (Doc. 61-8 at 1, emphasis added).  While the parties' mutual course of conduct should have made clear to Waterfront that U.S. Fire had serious concerns about the claim from the outset of its investigation, whether or not Waterfront was caught off guard that Forde (and not Ottey or the surveyors) had hired Leschaeve and would claim privilege for his work is not relevant to the underlying issue of whether Leschaeve was in fact hired by Forde.

### C. The Role of Attorney Forde

Obviously, a closely related dispute concerns whether Forde himself acted as U.S. Fire's attorney and/or as litigation counsel, or – as Waterfront puts it – Forde was acting simply as another claims handler, investigating the factual underpinnings of the claim.  If Forde acted primarily as a claims handler in the same manner as Ottey, then the fact that Forde is a licensed attorney does not shield his emails or other documents under the claim of attorney-client or work product privileges unless/until the parties became adverse and his role changed.   *See generally* S*t. Paul Reinsurance LTD v. Commercial Fin. Corp.*, 197 F.R.D. 620 (N.D. Iowa 2000) (holding that when counsel was only investigating whether factual basis existed, documents remained discoverable up until the date that insurer attempted to rescind policy).  And of course, if Forde only

---

[6]As indicated in the above facts, Waterfront's maintenance manager, Danny Thomas, also was present. Waterfront recently scheduled depositions of both surveyors.

hired Laschaeve in his capacity as a claims handler, just as Ottey hired Cuevas and Bacon to investigate the claim, then communications between Laschaeve and Forde also could not be withheld under either attorney-client or work product privileges.

Contrary to Waterfront's position, I conclude that U.S. Fire has put forth sufficient evidence to show that Forde was hired to provide legal advice, not as a glorified claims handler. (*See* Doc. 62-1, Forde Affidavit).  While privilege issues in cases involving a breach of insurance contract claim admittedly pose special difficulties, a party does not lose its right to claim an attorney-client privilege merely because it is an insurance company.

Cases in which an attorney is found to be acting as a claims handler for his/her insurance client often involve in-house counsel who act in more than one capacity, and whose involvement is clear from the claims file.  By contrast, in this case there is no dispute that U.S. Fire first retained Forde to address legal issues relating to coverage issues soon after Waterfront was notified of the likely denial of a significant portion of its February claim.  A formal declination of coverage was subsequently issued, and the February claim remained open at the time that the Barge sank.  U.S. Fire expanded Forde's duties soon after, at a time that the record suggests that the potential for future litigation was rapidly increasing.

Still, U.S. Fire's position that it "reasonably anticipated litigation" with Waterfront for the August claim even <u>before</u> the Barge sank, based on the February claim alone, goes a bit too far.  The fact that the parties were arguably adverse concerning the February incident does not mandate a conclusion that U.S. Fire anticipated litigation

over the wholly separate August 2014 claim.  Instead, the existing dispute between the parties over the partial denial of the February 2014 claim is but one piece of a larger contextual picture that informs the Court on whether (and at what point) U.S. Fire reasonably anticipated litigation over the August 2014 claim.

As discussed above, Waterfront relies heavily on Ohio case law concerning the scope of privilege in the context of bad faith insurance claims in order to argue that U.S. Fire cannot claim attorney-client (or work product) privileges for any work performed by Forde up until the date that U.S. Fire denied Waterfront's claim in January 2015, when it filed suit.  However, no similar controlling cases appear to exist under the federal common law, and even the cases on which Waterfront relies do not fully support its position. For example, in *Indianapolis Airport Auth. v. Travelers Prop Cas. Co. of Am.*, the court found evidence that "counsel's purpose was to interpret the policy, and investigate and evaluate the claim, [and] not [to] prepare for litigation…." in part because suit was not filed until *six years* after outside coverage counsel was engaged by the insurer.  *Id.*, 2014 WL 7360049 at *4, objections overruled 2015 WL 1013952 (S.D. In. Mar. 9, 2015).  However, even there, the court determined that the work product doctrine began to apply when the insured first threatened litigation eleven months prior to the insurer's formal denial of the claim.  *Id.* at *5.  While U.S. Fire's expansion of Forde's duties and issuance of its first reservation of rights letter five days later may not be sufficient *alone* to show that Forde was preparing for litigation, in this case Waterfront itself threatened litigation on August 20, 2014.  Thus, both Forde's affidavit and the parties' entire course of dealing strongly support U.S. Fire's position

that it engaged Forde for the purpose of obtaining legal advice, and that it anticipated litigation months before it formally denied the claim and filed suit.

### D. In Camera Review Not Required

Based on little more than a bald assertion that Forde was acting as a claims handler, Waterfront invites the undersigned to conduct a broad *in camera* review of every document concerning Forde as to which U.S. Fire has claimed a privilege. Conducting a large-scale *in camera* review of documents as to which an objectively reasonable privilege has been asserted is highly disfavored, both for obvious reasons of judicial economy, and because neither the parties nor the public interest are well-served by increasing litigation costs relating to discovery disputes. *See generally William Powell Co. v. National Indemn. Co.,* 2017 WL 4315059 (S.D. Ohio Sept. 26, 2017) (declining suggestion that standard for *in camera* review under Ohio law is binding on federal courts); *Rugero v. U.S. Dep't of Justice*, 257 F.3d 534, 543-44 (6th Cir. 2001) (noting that *in camera* review under FOIA should be used "sparingly," and encouraging alternative procedures such as use of detailed affidavits to describe the content of the material withheld and its grounds for nondisclosure).

If upcoming depositions provide Waterfront with more concrete evidence to support its hypothesis that Laschaeve was not hired by Forde,[7] or that Forde (contrary to his affidavit and other evidence of record) actually acted as a claims handler rather than as legal counsel, then Waterfront remains free to renew its motion for *in camera* review. On the record currently presented, however, there is no basis for such review.

---

[7]Waterfront also will have ample opportunity to discover Laschaeve's opinions if U.S. Fire decides to identify him as a testifying expert, as opposed to a mere consulting expert.

### III.    Conclusion and Order

For all the reasons stated herein, **IT IS ORDERED THAT** Waterfront's motion to compel (Doc. 61) is **DENIED**.

*s/ Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge
